```
              UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____
                                 )
THOMAS E. HORNISH AND SUZANNE    )
J. HORNISH JOINT LIVING TRUST,   )
et al,                           )  CASE NO. C15-284MJP
              Plaintiffs,        )
                                 )  SEATTLE, WASHINGTON
v.                               )  April 14, 2016
                                 )
KING COUNTY,                     )  MOTION FOR
                                 )  SUMMARY JUDGMENT
              Defendant.         )
                                 )
_____
```

```
              VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE MARSHA J. PECHMAN
              UNITED STATES DISTRICT JUDGE
_____
```

APPEARANCES:


 For the Plaintiffs:     THOMAS S. STEWART
                         ELIZABETH McCULLEY
                         Stewart Wald & McCulley LLC
                         2100 Central, Suite 22
                         Kansas City, MO 64108

 For the Defendant:      DAVID HACKETT
                         King County Prosecutor's Office
                         500 4th Avenue
                         Seattle, WA 98104

                         DAVID FREEBURG
                         EMILY HARRIS
                         Corr Cronin
                         2001 4th Avenue, Suite 3900
                         Seattle, WA 98154

 Reported by:            NANCY L. BAUER, CCR, RPR
                         Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         (206) 370-8506
                         nancy_bauer@wawd.uscourts.gov

April 14, 2016                                    1:30 p.m.
                        PROCEEDINGS
_____

        THE CLERK:  Thomas Hornish v. King County, Cause No.
C15-284.

    Counsel, please make your appearances for the record.

        MR. HACKETT:  David Hackett representing King County,
the defendants, and with me is Emily Harris and David
Freeburg, also representing King County.

        THE COURT:  Good afternoon.

        MR. STEWART:  Thank you, Your Honor.  Tom Stewart and
my partner, Elizabeth McCulley, for the plaintiffs.

        THE COURT:  Counsel, you should have received a set
of questions that I'd like to have you address at some point
during the course of your argument, and I'd ask you to meet
and confer and decide the order of argument.  I got a little
bit of back-and-forth.  What can you tell me is your final
decision about that?

        MR. HACKETT:  I believe we have a consensus, Your
Honor, that I will go first for 20 minutes, and then
Mr. Stewart will go.  I'll have a ten-minute rebuttal, and
then Mr. Stewart will finish up.

        THE COURT:  Okay.

        MR. HACKETT:  Good afternoon, Your Honor.  I thought
it would be appropriate to turn immediately to the court's
questions so that those don't get lost in the time crunch.

1    The court's first question about whether plaintiffs

2  dispute that King County has paid the taxes on the disputed

3  corridor, as the record currently stands, there is no

4  evidence from plaintiffs disputing King County's payment of

5  taxes and fees on that corridor.  In fact, the declaration of

6  Sue Sweany, which is attached to my declaration -- or,

7  actually, it is filed separately, is uncontroverted to this

8  point.  It establishes that King County has paid all taxes

9  due and fees since 1998.

10    The second question, are there any disputed facts which

11  would prevent the court from deciding the case as a matter of

12  law?  We believe that the correct answer to that question is

13  no.  The plaintiffs have failed to controvert the relevant

14  facts that are appropriate to this.  They have, essentially,

15  one declaration from Mr. Morel and another declaration from

16  Mr. Rall, both which have substantial portions that are

17  inadmissible, but both of which have failed to directly or

18  indirectly address the issues that are before the court.

19  I'll try and explain that further as I go through.

20    The Rall declaration, as I stated, we believe it is

21  conclusory and inadmissible.  The Morel declaration simply

22  states that his family used the railroad property.  It does

23  not establish any right, i.e., like an adverse possession

24  right or some right that would give him ownership over the

25  property, and, in fact, his 1996 deed -- his family's 1996

1    deed with the railroad recognized the 100-foot corridor and

2    bought the outer 25 feet on each side from the railroad.  So

3    Mr. Morel cannot get past his own chain of title in that

4    regard.

5         The third question, how do plaintiffs respond to the

6    county's argument that possession has been established

7    through operation of RCW 7.28.070, the payment of taxes

8    statute?  In their response materials, plaintiffs simply did

9    not respond to this.  They instead argued to the court that,

10   procedurally, it should not be in front of the court.  We

11   addressed that very clearly in our reply, pointing out that

12   in our counterclaim we cited RCW Chapter 7.28 and provided

13   more than sufficient facts under notice pleading to alert all

14   parties that the width of the corridor was at issue and that

15   we, of course, would be raising 7.28 as one of the reasons

16   that our easement was established in that corridor.

17        7.28.070, unlike a regular adverse possession or

18   prescriptive easement, when you are holding a property under

19   color of title under that statute, as the State Supreme Court

20   has said and as the statute says, you own to the extent of

21   your paper title, so you own to the boundaries that are

22   actually stated in the paper title, and on this record there

23   is no dispute that those boundaries in the adverse possession

24   areas are 100 feet, except where there have been specific

25   prior transactions, like the one between Mr. Morel and the

1   railroad.  In that case, of course, it is 50 feet.  But that

2   paper title establishes the primary issue in dispute in this

3   case.

4        The fourth question, what evidence do plaintiffs have that

5   a 100-foot corridor is not necessary for operations

6   permissible under a railroad easement?  We have cited to the

7   court the case law that a railroad easement, even when it's

8   obtained through a prescriptive easement or adverse

9   possession, recognizes that you are not limited solely to the

10  ballast and the tracks, but that it includes what is

11  necessary to run a railroad.

12       In this regard, the court has substantial evidence for it.

13  The declaration from Mr. Nuorala, which is attached to my

14  declaration, made back in the early '90s.  Mr. Nuorala worked

15  for BNSF and explained why the railroad needed that safety

16  zone, both to maintain its tracks and to make sure that

17  derailments and things like that did not impact adjacent

18  homeowners.

19       The Sullivan declaration that we submitted, also attached

20  to my declaration, is also not controverted.

21       And then, finally, the court has the overall layout of the

22  corridor, and that corridor, as the STB points out, is

23  between -- is generally 100 feet wide.  It varies sometimes

24  down to 50 and sometimes as much as 200, but the overwhelming

25  both sides of the adverse possession area are 100 feet, so it

1   makes sense to continue that 100 feet.

2       And then finally is the issue of what the county can do

3   with the land rights.  We would say that the issue of

4   declaratory judgment as to the nature of rights in that

5   property is ripe.  Understanding that we own a railroad

6   easement, that that railroad easement gives us exclusive use

7   and control and possession, and that that railroad easement,

8   consistent with Washington case law, allows incidental uses

9   that are consistent with the easement itself.

10      The issue of building the trail, of course, is ripe.  King

11  County is in the process of doing that.  These plaintiffs,

12  through the *Shore Line* action, are challenging that.

13      The question of are other specific incidental uses ripe,

14  we would argue that they are not ripe at this point.  Once

15  the parties know what their relative rights are, i.e., that

16  we have a railroad easement that is consistent with

17  Washington law, we can make incidental uses of that easement,

18  build a trail.  If some use comes to light or if some use is

19  proposed on specific use down the road, at that point

20  adjudicating that use within that context of rights

21  established in this action we think would be ripe, but the

22  court does not need to, you know, determine if overhead power

23  lines are appropriate, or if train tracks are appropriate, or

24  any of the things that go on in the *Kaseburg* matter, because

25  no one is proposing those uses.  We're talking about a trail,

1   and we're talking about continued use of the railroad

2   easement during the life of that trail, and possible future

3   activation.

4        So while the briefing in this case is complicated, it

5   basically boils down to two overarching issues, and the first

6   overarching issue would be due to railbanking under the

7   Trails Act.  King County holds BNSF's prior property rights,

8   plus new trial rights established by federal law.

9        What we are arguing here is that railbanking preserved all

10  of BNSF's property rights, including any portion of the

11  corridor that they held as an easement.

12       We are arguing that Washington's railroad easement, that

13  concept within Washington law, consistent with *Kaseburg*,

14  allows for exclusive use and possession of the area on,

15  above, and below the surface of the corridor, plus incidental

16  uses consistent with Washington law.

17       And then, finally, we're arguing, as BNSF's successor,

18  King County holds the rights that BNSF held, plus a trail,

19  the right to build a trail under the Trails Act.

20       So that's the first overarching idea.  The impact of the

21  Trails Act and the continuation of BNSF easements, which have

22  existed in that area for about 125 years.

23       The second overarching question is plaintiffs' lack of

24  Article III standing to challenge King County's ownership,

25  because they do not own any portion of the corridor

1    whatsoever.

2         King County owns the portion of the corridor next to the

3    Hornish plaintiffs in fee, as we will argue below, that the

4    remaining plaintiffs, except where narrowed by private

5    transactions, the record establishes that King County owns a

6    100-foot railroad easement over those properties, and that

7    would be through operation of 7.28, through the 1895 assessor

8    records, the 1908 probate action, and the 1917 val maps.

9         And then, finally, looking at Washington Centerline

10   Presumption, none of plaintiffs' current deeds allow them to

11   claim to the centerline of the railroad property, and that's

12   especially true for Mr. Hornish, since the property next to

13   him is owned in fee.

14        So I'll turn more specifically to those, and, of course,

15   be happy to answer any questions the court may have.

16        First, railbanking did preserve the BNSF property rights

17   for King County's purchase, which we did purchase, and added

18   the right to have a public trail over that property.

19        The Trails Act, by its very language, preempted any

20   abandonment of BNSF's railroad easements, the portions of the

21   corridor that were held in easement.  Under the Trails Act,

22   which is, as the court is aware, at 16 U.S.C. 1247(d), it

23   states that the national policy is, quote, to preserve

24   established railroad rights-of-way for future reactivation of

25   rail service, end quote, and, quote, to protect rail

1    transportation corridors, end quote.  Those are the purposes

2    of the Act.  Congress is explicit in its purpose here.

3         The way Congress achieves those purposes is by using the

4    mechanism of federal preemption.  It uses preemption to

5    abandon any state law or to preempt any state law or state

6    doctrine that would result in abandonment of the easement.

7    And under the Trails Act, interim trail use is allowed, and

8    such interim use, quote, shall not be treated, for purposes

9    of any law or rule of law, as an abandonment of the use of

10   such rights of way for railroad purposes.

11        So, thus, you have the purpose of the Act and the

12   mechanism by which the Act achieves that purpose by

13   preventing state law abandonment.

14        The result of preempting state law, abandonment law, is

15   the existing state railroad easement, and the corridor that

16   is created by that easement remains in full effect right now

17   and forever in the future, as long as the Trails Act, at

18   least, is around.

19        The railroad easement that BNSF held and that King County

20   bought remains recorded under state property law.  You can go

21   down to the county courthouse, you can look up those parcel

22   numbers, and you can see who owns it.  And trail use is added

23   via the Service Transportation Board's issuance of the need

24   to.  A very straightforward mechanism that Congress has

25   adopted.

1    Plaintiffs' railroad purposes argument to get around this

2    explicit language is, frankly, irrelevant.  As Judge

3    Coughenour decided in *Kaseburg*, quote, it is immaterial

4    whether railbanking is a railroad purpose, because the Trails

5    Act preserves a railroad easement and preempts state

6    reversion law through the mechanism of railbanking,

7    regardless of the easement's original purchase.  That's what

8    Congress did.

9    There is no support for plaintiffs' claim of an elaborate

10   mechanism where the state railroad easement goes away, is

11   extinguished, and then somehow magically comes back after

12   being held in abeyance for some undefined period of time,

13   years and years down the road should a railroad return.

14   This plaintiff approach would leave the court with a

15   practical problem that would thwart the very purposes of the

16   Trails Act.  Plaintiffs are telling us that they are able to

17   use the corridor for any purpose as long as it does not

18   interfere with the trail.  What we know from the records,

19   according to Mr. Morel, is that includes things like houses,

20   trees, sheds, shacks, gazebos, roads, whatever -- whatever

21   they can imagine, as long as it doesn't bisect the trail or

22   prevent the public from using the trail.

23   If indeed the court can imagine a built-up corridor 20

24   years from now, it would be nearly impossible for a railroad

25   to be reactivated.  That's why the STB regulations and the

1   case law puts the responsibility on the trail sponsor, which

2   is King County, which also happens to be the owner of the

3   BNSF property rights, to make sure and keep that corridor in

4   shape so that reactivation is a possibility.

5       Plaintiffs fail to dispute the scope of a Washington

6   railroad easement at all.  There is no briefing addressed to

7   this.  Washington case law is clear that a Washington

8   railroad easement allows for exclusive use and possession of

9   the area on, above, and below the surface of the corridor,

10  plus incidental uses consistent with Washington law.  That's

11  what Judge Coughenour held in *Kaseburg*, and that's what we'd

12  also ask this court to hold.

13      It's also undisputed that King County is the purchaser and

14  the successor-in-interest to BNSF's property rights along the

15  corridor.  That would include the fee portions of the

16  corridor, like those next to Mr. Hornish, as well as any and

17  all easement portions of the corridor.

18      So for these reasons, looking at the Trails Act aspect of

19  this case, the court should enter summary judgment, finding

20  that the Trails Act preserved those BNSF easements, that

21  those easements, which are characterized properly as a

22  Washington railroad easement, are broad and robust, and that

23  King County currently owns those.

24      Turning to the standing question, plaintiffs simply do not

25  have Article III standing to challenge King County's

1  ownership.  King County owns the land -- and I'll address

2  first the Hornish plaintiffs.  King County owns that land in

3  fee.

4      The deed language, which is the Hilchkanum deed, and I

5  don't provide any warranty that I state that correctly at

6  all, but nonetheless, the Hilchkanum deed was determined by

7  the Ninth Circuit in *Rasmussen* and determined by the

8  Washington Court of Appeals in *Ray* to establish a fee.  That

9  precedent should continue to be good law and should be

10  binding, we would submit, on this court.

11      The only thing plaintiffs point out is the *Kershaw*

12  decision, but *Kershaw* is not a tremendous change in

13  Washington law.  Washington law has always recognized that

14  right-of-way has some ambiguities and that right-of-way is a

15  term that can go either direction.  Where *Kershaw* draws the

16  line, consistent with *Brown* and all the other case law that

17  was relied upon in both *Ray* and *Rasmussen*, is when the

18  granting clause limits the conveyance of the right-of-way for

19  a specific purpose.  So, for instance, I give, grant, donate

20  100 feet of rail -- or a corridor for the purpose of running

21  a railroad, that would be a granting clause that would have

22  that.  This granting clause doesn't.  It just says I grant,

23  donate, convey, or something along those lines, 100 feet of

24  property.

25      The other thing that you look at consistent with *Ray* and

1   *Rasmussen* is the addendum clause.  This addendum clause is

2   not limited in time to serving a particular purpose, like

3   running a railroad.  The conveyance is forever, and, thus, it

4   is consistent with *Kershaw*, and it is fully analyzed and

5   remains good law in *Rasmussen* and *Ray*.

6        King County owns the 100-foot railroad easement next to

7   the remaining plaintiffs.  And while there are some effort to

8   create factual issues through the Morel declaration, the

9   court can easily resolve this issue through reference to

10  RCW 7.28.070, which is a seven-year statute of limitations

11  when you hold a piece of property under good-faith color of

12  title and you have paid all taxes due during that period.

13       In addition to that, you have historical documents which

14  show acquiescence by Mr. Middleton, a common grantor to all

15  plaintiffs.  The 1895 assessor records for Mr. Middleton

16  point out that a 100-foot railroad corridor, if you do the

17  math, as in Mr. Nunnenkamp's declaration, was excluded from

18  the property that he was taxed on.

19       The fact that this is consistent with Mr. Middleton's

20  understanding is contained in the 1908 probate records, where

21  the court decided that a railroad corridor ran through that

22  land.  These plaintiffs are in privity with those folks back

23  in 1908 who received that property, and, thus, that court

24  finding from Pierce County binds them, but it also points the

25  court's attention to case law in our brief, which points out

 1   that if you're Mr. Middleton, and you buy a piece of property

 2   with a railroad going through it, you can't be surprised

 3   about that railroad being there.  Mr. Middleton couldn't be

 4   surprised, and certainly plaintiffs can't 125 years later.

 5       And then, finally, the corridor is 100 feet because the

 6   declarations from Mr. Nuorala and Mr. Sullivan established

 7   that that's generally what you need to run a railroad, and

 8   also, as Mr. Sullivan points out, pretty close to what you

 9   would need to reactivate a railroad.  To serve the purposes

10   of the Trails Act, and consistent with the state law, the

11   court should hold that the corridor next to the remaining

12   plaintiffs is 100 feet and that King County owns a robust

13   railroad easement over that stretch of the corridor.

14       Finally, I'd like to turn to the plaintiffs' lack of

15   standing due to centerline presumption ownership.

16       The court allowed plaintiffs to, essentially, take a

17   second bite at the apple, file an amended complaint to

18   address the centerline issues that the court found in its

19   prior orders.  Plaintiffs did that.  We have been waiting for

20   summary judgment to move on that as to -- so the court could

21   evaluate the success of plaintiffs' efforts.  And the problem

22   with plaintiffs' efforts are, as this court decided,

23   Washington law establishes that you not only have to

24   establish your chain of title, but your current deed has to

25   allow inclusion to the centerline.

1        So in circumstances where the deed is drafted to accept

2   the corridor, you cannot blame the corridor, because that

3   would be thwarting the intent of the parties to the deed.  In

4   this case we have gone in great detail in our brief and

5   pointed out, often using the court's prior analysis, where

6   plaintiffs' legal descriptions have a metes and bounds that

7   uses the corridor as a boundary.  Washington case law is

8   clear that that does not entitle them to the centerline

9   presumption, and then the rest of the deeds use "except"

10  language.

11       Now, plaintiffs point out that Mr. Rall, who is

12  essentially trying to provide a legal opinion to this court,

13  says that reserve is not the same, but these deeds don't use

14  reserve, they use except, and there is no -- no clearer way

15  for a grantor and a grantee to indicate their intent to the

16  court and the subsequent purchasers that you own everything

17  up to this point except the railroad corridor, and that's

18  what those deeds state, and that's why the centerline

19  presumption in Washington will not cross that boundary when

20  it has been specifically excepted by the deed.

21       So for these reasons, we would ask the court to enter

22  summary judgment for King County.  This case has been

23  resolved in King County's favor as a matter of law, and there

24  are no controverted issues.

25       Thank you.

1    THE COURT:  Thank you.

2    MR. STEWART:  May it please the court, Your Honor.

3  First, I'd like to thank the court for the opportunity today.

4  As someone who has been really subsumed with the Trails Act

5  for many years now, I appreciate the opportunity to actually

6  argue about these issues.

7    This case obviously involves the intersection or collision

8  of state property laws and the federal congressional act

9  known as the Trails Act.

10    King County's argument and conclusion that the railroad

11  purposes easement still exists is actually incorrect both as

12  a matter of state law and federal law.  And although I will

13  answer all the court's questions as I go through this

14  presentation, I think the very first issue that needs to be

15  addressed is the point that Mr. Hackett attempted to make,

16  that they own a railroad purposes easement.  And I believe

17  that is totally incorrect both as a matter of federal law and

18  as a matter of state law.

19    And their argument that the railroad purposes easement

20  still exists so that they can use the corridor in any fashion

21  that they wish, what they're really attempting to do is just

22  simply trample over these plaintiffs' property rights.

23    The ultimate result, as I will demonstrate, is that King

24  County, by and through the Trails Act, only acquired a trail

25  railbank easement with the right to build a hiking and biking

1    trail.

2        Because we have this collision of state law and federal

3    property law, I think it's first important to take a step

4    back and kind of define the chronology or the timeline of the

5    facts in the context of these various legal principles.

6        And first we need to start with the proposition that, for

7    purposes of these motions, that there really is no dispute

8    for everyone that's involved here, except Mr. Hornish, who I

9    will get to later, that the railroad only held an easement

10   for railroad purposes, or at least there shouldn't be any

11   dispute for purposes of these motions.

12       And we have been diverted somewhat from the basic

13   principle when we discuss the scope of the railroad purposes

14   easement, because it is actually somewhat of a red herring.

15       There has certainly been a lot of discussion about the

16   scope of a railroad purposes easement under Washington law

17   with respect to incidental uses.  But the entire discussion

18   concerning incidental uses is only relevant if the railroad

19   purposes easement is still in place, and it's not.

20       The scope of the railroad purposes easement is important

21   in this context, for purposes of these motions today, not

22   because of incidental uses, but instead is really only

23   relevant under state law property concepts, and that is

24   because, under this chronology and these facts, a new

25   easement, by and through the Trails Act, beyond the scope of

1   the existing railroad purposes easement, converts the

2   railroad purposes easement to a trail railbank easement under

3   state law and holds it in abeyance for the possible

4   reactivation later.

5       And I think it is important, as Mr. Hackett mentioned, to

6   also intervene with a second step in this process for a

7   moment and take a closer look at what the Trails Act actually

8   says and what it does.

9       The Trails Act amendments that we're talking about today,

10  Section 1247(d), was passed by Congress in 1983.  And there

11  is no question but that the purpose of the Trails Act was to

12  first and foremost encourage and promote recreational trails.

13  These issues went to the United States Supreme Court in 1990

14  in the first *Preseault* opinion, and the Supreme Court

15  specifically talked about the history and purposes of the

16  Trails Act.

17      It then went back on remand to the Federal Circuit in

18  *Preseault II* in 1996.  And *Preseault II*, in 1996, defined the

19  nature of the property interest that the railroads acquire.

20  The entire purpose of the Act was to encourage and establish

21  hiking and biking trails by taking railroad corridors that

22  would have been abandoned and that were actually abandoned

23  but for the fact that the Trails Act intervenes, blocks the

24  reversionary interest to the adjacent landowners so that a

25  trail user can construct a hiking and biking trail on an

1   interim basis.  And it is abandoned, but for the Trails Act,

2   with this possible reactivation.  That is what the Trails Act

3   does.  That is the railbanking provision of the Trails Act.

4        And it's interesting, because Mr. Hackett quotes part of

5   Section 1247(d), and they talk about the fact that Congress

6   says that the intent was to preserve established railroad

7   rights-of-ways for future reactivation.  And they protect

8   those corridors so that the federal government can maintain

9   jurisdiction over them rather than revert back to the

10  adjacent landowners, and they can be held in abeyance so that

11  the public can use them for a hiking and biking trail on an

12  interim basis.

13       The Trails Act, an important point is, is it does not

14  preserve rail corridors for current rail use, but rather

15  preserves the former rail corridor for future rail use while

16  allowing it to be used in the interim as a recreational

17  trail.  That is precisely and exactly what the Trails Act

18  says.

19       Another way to look at it would be to say, what railroad

20  purposes is it preserved for, when the only one with rights

21  to use it for railroad purposes has abandoned it by and

22  through the Trails Act.

23       Under Washington law, and this is really the law anywhere,

24  conversion to a trail would be a taking, because the railroad

25  easement would have extinguished, which is evidence that the

1  former railroad corridor cannot be used for incidental uses

2  because trail use is not incidental to the railroad purposes

3  easement.  That is actually a direct quote and a finding from

4  the Supreme Court of Washington in the *Lawson* opinion.

5      And railbanking, which is the preservation of railroad

6  rights-of-way for future use, allows federal jurisdiction to

7  remain, but it blocks the reversion to the adjacent

8  landowners.

9      The third step in understanding what happens here is to

10  actually look at the timeline of what occurs.  The first

11  thing that must occur is the railroad must petition to

12  abandon the right-of-way, which is exactly what happened.

13  Here, the first step in the process is that BNSF petitioned

14  the STB to abandon it.

15      The second thing that occurred is that King County

16  specifically requested the STB to determine if the

17  right-of-way would be appropriate for interim trail use.

18      And, third, then the STB acts on that request, and allows

19  it to be used for a hiking and biking trail.

20      Once the abandonment -- or once the railroad abandons it,

21  and once there is an agreement to use it as a trail, the

22  Trails Act then blocks reversion to the fee owner, which in

23  this case is, basically, the adjacent landowners.

24      Now, this whole process is called railbanking, and

25  railbanking does not preserve the railroad purposes easement

1    for current railroad uses under federal law, because

2    railbanking is not a railroad purpose under federal law.  And

3    there are two primary reasons why King County cannot use it

4    for current purposes other than a hiking and biking trail.

5        The first is that railbanking is not a railroad purpose

6    under federal law, and the second is that the railroad

7    purposes easement is extinguished, held in abeyance by the

8    Trails Act, upon the change in use from a railroad purpose to

9    a hiking and biking trail easement.

10       Now, I first want to talk a little bit about railbanking

11   is not a railroad purpose.  This is actually the result of

12   overwhelming authority.  It starts, really, with the Supreme

13   Court in 1990 and the Federal Circuit in 1996.  But there

14   have probably been 50 or more cases that we've been involved

15   with where the courts have found that railbanking is not a

16   current railroad purpose and does not allow it to be used for

17   current railroad purposes.

18       I can cite to all 50, but there are three that are

19   important.  Probably the first one is the Federal Circuit

20   opinion in 1996, *Preseault II*, where they rejected the

21   railbanking argument as allowing current railroad uses

22   because it was a vague notion incapable of overriding the

23   present use as a recreational trail.

24       The *Longnecker* case that we were involved in as well

25   actually involved Washington law, down in Olympia, and the

1    federal court -- the Court of Federal Claims reiterated the

2    exact same thing:  That it does not allow current railroad

3    uses.

4        And then, finally, in 2009, in the *Rogers* case in Florida,

5    where they specifically said, here, as in *Preseault II*, the

6    use of the right-of-way as a public trail while preserving

7    the right-of-way for future railroad activity was not

8    something contemplated by the original parties and exceeded

9    the scope of the original railroad purposes easement.

10       The federal government, similar to what King County is

11   doing here, has really attempted to make this argument, for

12   years, that the railroad purposes easement exists, and that

13   the hiking and biking trail easement is added to it, stacked

14   on top of it, and that is simply not so.  That argument made

15   by the federal government, probably 50 times, has been

16   rejected each and every time it was made.

17       A railbank easement, by definition, is the preservation of

18   the railroad corridor for future railroad activities.  That

19   is exactly what the Trails Act says, and it is not the

20   current right to use the railroad purposes easement.

21       And the second point I want to make in that regard is, if

22   the railroad purposes easement was available for current uses

23   as railroad purposes, there would never be any Trails Act

24   takings cases.  And the reason for that is, is that what is

25   taken, what is blocked by the Trails Act are these

1    landowners' reversionary rights to get their land back.  And

2    if the railroad purposes easement still existed such that the

3    hiking and biking trail easement was stacked on top of it,

4    that reversionary interest would never vest because it was

5    never taken from them in the first place.

6            THE COURT:  Counsel, you've got to help me understand

7    just exactly what your clients get out of this.  Whether

8    there's one easement or two rights stacked on top of each

9    other, the land is going to be used as a trail.

10           MR. STEWART:  It is going to be used as a trail, Your

11   Honor, but --

12           THE COURT:  So what is it that they're really looking

13   for?  Is it the 100 feet?

14           MR. STEWART:  Well, that's one issue, Your Honor, and

15   that's very important.

16       But to answer one of the questions that you asked last

17   night is that, is what the county can do with the land an

18   issue, and is what the county can do with the land right,

19   yes, because -- and the question was what are the plaintiffs

20   trying to stop?  Keep in mind that this was the

21   government's -- or the government -- King County's motion to

22   say that the railroad purposes easement still exists so they

23   can use it in any fashion they want.

24       And if there was a current use planned in addition to a

25   hiking and biking trail, I think the court is absolutely

1   correct that that would be the subject of an injunction.

2       But here, though, this is a declaration of rights as to

3   who owns the fee and the land.  King County says they own the

4   fee and the land, and we believe they do not.  They own a

5   hiking and biking trail easement pursuant to the Trails Act.

6   And we want King County to stop trampling on these

7   plaintiffs' property rights by claiming that they own the fee

8   in this corridor.

9       Now, the issue of width is also extremely important, Your

10  Honor, because there are a whole bunch of problems with the

11  width, because not only are they claiming they own the fee,

12  they're claiming they own the fee which is a hundred feet

13  wide.

14      And the question that was asked last night was, what

15  evidence do plaintiffs have that a 100-foot-wide corridor is

16  not necessary for the operations permissible under a railroad

17  easement, is not only the case law in Washington for decades,

18  but what is necessary for railroad operations is what the

19  railroad actually used.

20      And here, for a hundred years, what the railroad actually

21  used is about 14 to 18 feet wide.  And so the fact of the

22  matter is that, besides Gene Morel's declaration, the width

23  issue is huge, because they do not own -- even if they were

24  deemed to own the fee, they don't own a fee 100 feet wide.

25  It would be between 14 and 18 and probably 20 feet at every

1 location along this trail.  And the best evidence of that is

2 probably Mr. Morel's declaration, which would have, if they

3 owned a hundred feet wide, it would be right in the middle of

4 Mr. Morel's living room.

5 　　　The other thing that is evident from Mr. Morel's

6 declaration, and just a cursory examination of photographs of

7 this area, is that there is a huge boulder that's been there

8 for decades.  Mr. Morel described how he actually climbed on

9 that as a kid.  The railroad right-of-way goes by there, and

10 they, obviously, didn't move that boulder.  It's 14-feet wide

11 at that location.

12 　　　In addition, all of these structures that Mr. Hackett

13 talked about, Mr. Morel is a good example, where there's a

14 driveway, there's concrete steps, there are plantings,

15 shrubbery, all kinds of buildings on these sites.  Many of

16 these people own on both sides.  They have a house on one

17 side, and they have a lake house or a changing room or

18 something else close to the lake.

19 　　　The fact of the matter is, there is a wall that's been

20 built decades ago that are describing exactly what the width

21 of this corridor is that the railroad actually used.  And so

22 the width of this is a huge issue.  And there is all kinds of

23 issues associated -- fact issues associated with how wide

24 this corridor is.

25 　　　Let me -- before I finish on the width issue, Your Honor,

1    I want to make one other point, and that is the state law

2    concepts here.

3        It is clear that under federal law the railroad corridor

4    is not preserved for current uses.  If it were, railbanking

5    would be a railroad purpose.

6        If you look at -- what happens when the Trails Act is

7    implemented, it blocks the abandonment that would ordinarily

8    occur.  So the landowners don't get their land back.  But the

9    second part of what occurs under state law is that the change

10   in use from a railroad purposes easement to a hiking and

11   biking trail easement operates to extinguish the railroad

12   purposes easement under state law, and that's just basic

13   property law.  There should be no legal question or legal

14   issue that trail use under the Trails Act does not fall

15   within the scope of a railroad purposes easement.  It's been

16   said 50 times or more.  It is also not added on to the

17   railroad purposes easement.

18       In fact, one of the leading cases on that exact subject

19   comes from the Supreme Court of Washington in *Lawson*.  The

20   railroad purposes easement extinguishes under state law

21   because of the change-of-use that is permitted by the federal

22   law.

23       And here's what happens:  The railroad's easement

24   extinguishes because of the changing use of a railroad

25   purposes easement under state law due to the fact that it is

1    converted to a new easement under extensive and numerous

2    authority.  And what's interesting about that is, the Supreme

3    Court of the United States, actually, cited *Lawson* with

4    approval in the 1990 opinion, and it basically said,

5    "Reference to state law has guided other courts seeking to

6    determine whether a railroad right-of-way lapsed upon

7    conversion to a trail use," and then cited *Lawson* for the

8    proposition that the change in use would give effect to that

9    reversionary interest.

10            THE COURT:  Counsel, you're about to run out of

11   time --

12            MR. STEWART:  Oh, I'm sorry, Your Honor.

13            THE COURT:  -- but I want to ask you what's your

14   response to RCW 7.20 --

15            MR. STEWART:  I'm happy to talk about that, Your

16   Honor.

17       RCW 7.20.070 doesn't apply at all.  It's preempted by the

18   Trails Act, as Mr. Hackett said.

19       Federal jurisdiction -- the federal government has

20   jurisdiction over these rights-of-way.  The Trails Act has

21   preempted those state statutes that disagreed with it.  King

22   County can't adversely possess against the federal

23   government.  Landowners still have their reversionary

24   interest.  Their reversionary interest has simply been

25   blocked by the Trails Act.

1          THE COURT:  Well, let's back up here.  I might buy

2     that they can't adversely possess against the government, but

3     why is it that they can't adversely possess against your

4     clients?

5          MR. STEWART:  Because the Trails Act doesn't allow --

6     they allow them to use it on an interim basis for a hiking

7     and biking trail.  There is nothing that allows them to

8     transform a railroad purposes easement into fee ownership

9     simply and solely by possessing it as a hiking and biking

10    trail for seven years.

11        Otherwise, under any scenario where any trail user

12    anywhere around the country utilized the trail for a

13    seven-year period of time, they would then acquire fee

14    ownership.  That's not the law.

15        And if you look at the actual statute itself -- because

16    one of the questions was whether King County pays taxes on it

17    or not.  First of all, they keep talking about color of

18    title.  Every person in actual, open, and meritorious

19    possession of lands or tenements under claim and color of

20    title, they received, purportedly, a quitclaim deed from the

21    railroad.  They do not -- which that quitclaim deed, even as

22    Judge Coughenour indicated, is merely transferring what the

23    railroad had.  It had a railroad purposes easement.

24    Vis-à-vis our landowners, the color of landowner doesn't work

25    because there is no color of title versus our landowners.

1      And the irony of all ironies is, is that even if you look

2   at Mr. Morel's declaration, if it's sauce for the goose, it's

3   sauce for the gander, because if there was adverse possession

4   for King County, all of these improvements that have been

5   built within the hundred feet -- in Mr. Morel's case, up to

6   about eight feet or ten feet from the centerline of the

7   right-of-way that have been in there for a long time,

8   decades, and all of the construction since 2000, he would

9   then get adverse possession against the fee ownership because

10   it's been there for decades.

11      And so they can't claim an adverse possession of a

12   hundred-foot easement when the railroad only used it for 14

13   feet in the first place.  And if the statute works for King

14   County, it also works for Mr. Morel and every other landowner

15   along this right-of-way who's also built fences and parking

16   and everything else along the right-of-way, too.  They

17   adversely --

18            THE COURT:  Are you telling me that because the

19   railroad didn't extend something or build something 100 feet

20   out, that's all that's really left is the 14 feet?

21            MR. STEWART:  That's correct, Your Honor, under

22   Washington law.

23      In a prescriptive easement situation --

24            THE COURT:  Counsel, you've run out of time.

25            MR. STEWART:  Sorry, Your Honor.  Thank you.

1           MR. HACKETT:  Thank you, Your Honor.

2       I'd first like to briefly address this whole

3    railroad-purposes-easement-not-existing-anymore argument.

4       Plaintiffs argue that the BNSF easements have been

5    extinguished, they've been abandoned, they don't exist

6    anymore, and that is just flatly contrary to the Trails Act.

7    That's why the Trails Act exists.  It was a response to cases

8    like *Lawson*, which were pre-railbanking, where the state

9    railroad easement would extinguish.  The thing that keeps the

10   state railroad easement from extinguishing is the Trails Act.

11   And the Trails Act, by using that mechanism of preemption of

12   any state abandonment laws, continues that easement into the

13   future, thus allowing King County to buy it, as we did.

14       The Trails Act --

15           THE COURT:  Presumably for the fact that at some

16   point in the future, the feds need it, they'll take it back?

17           MR. HACKETT:  Yes, although I believe the way that it

18   would work is -- and, in fact, the way it does work --  is --

19   is -- a lot of times the trail sponsor doesn't buy the

20   corridor.  We went the extra step of buying the corridor in

21   this instance.  If a bona fide railroad wanted to reactivate

22   that, we have base reactivation petitions, then that matter

23   goes in front of the STB, and then we are obligated to

24   facilitate that.  It might be that we have to sell the

25   corridor or we have to rent the corridor, but these things

1   happen.  Our responsibility as the trail sponsor is to make

2   sure that that corridor remains in good shape so that it can

3   be reactivated in a court of federal law.

4       If that --

5           THE COURT:  But presumably the county could have its

6   own light rail system through there.

7           MR. HACKETT:  The county presumably could become a

8   railroad itself and operate something along there, if we

9   so -- because we do own the property rights.

10      If that railroad purposes easement didn't continue to

11  exist due to the impact of the Trails Act, plaintiffs would

12  not even have a taking in this case.  They wouldn't have

13  millions of dollars to seek before the Federal Claims Court

14  in a Tucker Act proceeding.

15      It's that mechanism of preemption of the state law

16  abandonment that gives them the right to takings remuneration

17  for the taking of their reversionary interest.  So, thus, the

18  takings cases that the plaintiffs cite are really neither

19  here nor there.  They're important for determining if there

20  are takings, but they do not address the cogent issue before

21  this court, which is what easement remains post-taking, and

22  that's what was addressed in *Kaseburg* and the cases cited in

23  *Kaseburg*.  Plaintiffs have failed to cite a single case to

24  the contrary of Judge Coughenour's holdings or the cases that

25  Judge Coughenour cites.

1     In fact, all the cases addressing this cogent point

2  determine that the railroad easement continues, and that a

3  trail easement is added on top of it.

4     Now, I don't think it matters whether it's a new, single,

5  all-purpose easement or whether it's the old easement

6  continuing plus a trail easement, but the thing that is

7  uniform among all those courts is that the rights included in

8  the state law railroad easement continue and the Trails Act

9  adds trail use.

10        THE COURT:  So are you claiming both the fee interest

11  and an easement interest?

12        MR. HACKETT:  No.  I don't know where they get the

13  idea that we're claiming a fee interest from.

14     In the Hornish case, we own that corridor in fee.  It was

15  not railbanked.  It was part of railbanking, but railbanking

16  doesn't extinguish a fee.  The fee continues.

17     So the only thing that we're talking about with regard to

18  the Trails Act are portions of the corridor that we own an

19  easement, and for these plaintiffs, those are the plaintiffs

20  in the so-called adverse possession area.

21     The problem with plaintiffs' argument is it confounds the

22  purposes of the Trails Act with the mechanism that Congress

23  used to achieve those purposes, that mechanism being

24  preemption of state law abandonment of the existing railroad

25  easement.  When you preempt -- when you prevent that

1   abandonment, by definition that easement that wasn't

2   abandoned continues.

3        There is nothing in the statute about an elaborate

4   mechanism of having a railbank back in D.C. where they hold

5   the easement until it's needed someday.  If Congress had

6   wanted to do that, it would have adopted a much more

7   complicated mechanism than the one it did adopt for simply to

8   preempt state law, thus allowing the easement to continue.

9        I want to explore a little bit, too, the practical

10  problems with plaintiffs' approach.  No way to protect the

11  corridor up until a bona fide railroad wanting to come back,

12  no place to go to figure out where this unknown federal

13  easement is recorded, no way to put the property to

14  beneficial use during the period that the interim trail use

15  is there.

16       And let's keep in mind that right now on that trail you

17  have crossings, you have utilities, like power and telephone,

18  that rely on the existence of the BNSF easement to continue.

19  The fact that that easement is there means that that property

20  can continue to be put to beneficial use.

21       Finally, the corridor is preserved for incidental use down

22  the road.  So if somebody wants to build a new house or

23  somebody wants to put in a new utility, the trail sponsor, in

24  this case King County, because they own the easement along

25  the adverse possession plaintiffs, can provide permission to

1   do that within the broad idea of a Washington railroad

2   easement.  Incidental use is allowed pursuant to that

3   easement.  It keeps property active as opposed to putting it

4   someplace where it can't be used for any purpose.

5            THE COURT:  So Mr. Morel can rest assured you're not

6   going to put the trail through his living room?

7            MR. HACKETT:  Mr. Morel, as he has done in the past

8   with King County and he has done with the railroad, may have

9   to pay special use permits for his use of public property,

10  and that is the way that things are currently.

11       I'd like to address also the evidence of 100 feet is

12  necessary.

13       You do have the Morel declaration, but Mr. Morel is not

14  qualified to say what a railroad needs to operate.  It's

15  railroad operations.  The only competent testimony before the

16  court on that question are the Nuorala declaration and the

17  Sullivan declaration.  In addition, those establish that you

18  do need roughly 100 feet, as the railroad purchased up and

19  down the corridor back in the 1890s, to operate a railroad.

20       The historic documents establish this 100 feet.  You have

21  the Middleton acquiescence that I talked about in my opening

22  presentation.  You have the ICC valuation maps, of course now

23  the STB.

24       Playing on a rock, having your swing set there, building a

25  fort near the tracks, that does not overcome what is needed

1   for a railroad purpose.

2       The point is that if the railroad decides that that rock

3   isn't appropriate because maybe it has larger locomotives or

4   maybe it's concerned or maybe there is a mudslide, it can do

5   something about that.  If somebody builds a gazebo 45 feet

6   from the tracks, and due to a derailment, or whatever

7   happens, something needs to be done with that gazebo, by

8   having exclusive use of possession, it's the railroad -- in

9   this case, King County, the holder of the property, that gets

10  to decide what uses are compatible with either the railroad

11  or the public trail in this instance.

12      But let's say even if Mr. Morel somehow established

13  adverse possession through his swing set and the rock and

14  other miscellaneous uses, family picnics, which, of course,

15  you can't do under Washington law, RCW 7.28.070 still comes

16  into play to make this an easy, straightforward case for the

17  court to decide a 100-foot corridor.

18      And that statute -- plaintiffs do give you a colorful

19  argument how that statute is preempted by federal law.

20  Indeed, the corridor is under STB regulation.  The corridor

21  is under King County control, something which the STB

22  specifically approved in this case, due to the unusualness of

23  a county purchasing a corridor.

24      The King County -- the federal courts, including the U.S.

25  Supreme Court, have recognized that questions of property law

1    do fall to state law, and 7.28 is consistent with that idea.

2    It's not a mechanism that leads to an abandonment of railroad

3    easements, thus to be preempted; instead, 7.28 is a statute

4    that is there to ensure that corridors remain in beneficial

5    use, or any property remains in beneficial use.

6        We clearly hold the property under color of title.  A deed

7    granted by BNSF that describes a 100-foot corridor, we

8    clearly have paid all taxes that have been due since 1998,

9    and we have paid all fees.

10       Plaintiffs have nothing.  They have not briefed this

11   issue, and it's too late to come forward and argue that it's

12   somehow preempted on a theory that, frankly, is difficult to

13   follow.

14       So for those reasons we would ask that the court grant

15   summary judgment.  We need to have the cloud on our title

16   removed so that we can proceed with the public trail and so

17   that we can protect the corridor for future possible railroad

18   use.

19       At this point, as Mr. Morel's own declaration points out,

20   the homeowners believe that they can dictate how wide the

21   corridor is.  The homeowners believe that they can dictate

22   how wide the trail is going to be, how it's going to be

23   constructed, what use the public gets to make of its own

24   property.  That is not the way it is supposed to be.

25       King County, on behalf of the public, bought this

1  corridor.  It paid money for that to BNSF, and, actually,

2  through the land conservancy, it is there to place that trail

3  for public use, and to preserve the corridor in accord with

4  the Trails Act, and we would ask that the court remove the

5  various clouds from title the plaintiffs are trying to put on

6  King County's ownership of the property.

7      Thank you.

8          THE COURT:  Thank you.

9          MR. STEWART:  Thank you, Your Honor.

10      Mr. Hackett's recitation of the Trails Act is completely

11  and diametrically opposed to not only what the Trails Act

12  says, but the law on this subject.

13      By definition, by what the Supreme Court has said, by what

14  the Federal Circuit has said, is that the railroad purposes

15  easement is converted to a hiking and biking trail easement,

16  and that conversion extinguishes the railroad purposes

17  easement as a matter of law.

18      Mr. Hackett said that the Trails Act takings cases are not

19  relevant to these proceedings, but, in essence, they are

20  directly and exactly relevant because all of them

21  specifically deal with the language and purpose of the Trails

22  Act, which allows for future reactivation called railbanking,

23  and defines that as not a current railroad purpose that

24  allows them to use it in any fashion that they wish.

25      He also indicated that *Lawson*, which is controlling

1    precedent on this issue, came before the Trails Act was

2    amended in 1983.  But the fact of the matter is, if you look

3    at what the Supreme Court said about *Lawson* in 1990, and if

4    you look at what the Federal Circuit said about *Lawson* in

5    1996, and specifically said that it was a case on all fours

6    with *Preseault II*, which was the exact same issues that are

7    involved in this case now, basically, then that's telling of

8    exactly what the Federal Circuit believes.

9         And I recognize, Your Honor, that the Trails Act is not

10   interpreted often in Seattle or other parts of the country,

11   but I do know that it's been interpreted over 50 times by

12   judges in the Court of Federal Claims, who deal with these

13   issues every day.

14        I also know that, for example, on the Hilchkanum deed that

15   Mr. Hornish -- or that applies to Mr. Hornish's property that

16   Mr. Hackett talked about, the fact of the matter is, is that

17   that deed was and did go to the Ninth Circuit, based upon an

18   interpretation of Washington law that changed in 2006 in the

19   *Kershaw* opinion.

20        And I also recognize that, although Judge Horn's

21   interpretation of that deed, who is also a district court

22   judge on the Court of Federal Claims, is not binding on this

23   court.

24             THE COURT:  Well, counsel, this is a national act,

25   and I'm positive that there may be other circumstances where

1    the taking would be appropriate.

2        But counsel's pointed out that they bought it, and so

3    whatever another judge did on the federal court of claims, I

4    don't understand what relevance it has to me deciding this

5    particular fact pattern.  It's not binding precedent.  I

6    don't know what the fact pattern is in Vermont or Minnesota

7    or Tennessee.  All of those people may have had very good

8    taking claims.

9            MR. STEWART:  They do, Your Honor, and they did here

10   in Seattle as well.

11           THE COURT:  Well --

12           MR. STEWART:  The interpretation of the Trails Act on

13   these exact principles, under both federal and state law,

14   although not binding, should be persuasive on these exact

15   points.  And King County --

16           THE COURT:  Wait just a second.  You're telling me

17   that your clients brought taking claims to the Federal Claims

18   Court?

19           MR. STEWART:  Yes.  I didn't bring them.  They were

20   brought by another attorney here on Lake Sammamish.

21           THE COURT:  All right.

22           MR. STEWART:  And those issues are prevalent in every

23   takings case, just like those other cases that went to the

24   Court of Federal Claims.

25       On the --

```
 1            THE COURT:  So what is the decision?  Where is it?
 2            MR. STEWART:  That one is still pending, I believe,
 3   Your Honor.  It may be the oldest running case in the history
 4   of Trails Act takings cases, but --
 5            THE COURT:  I see.  So they have not been successful?
 6            MR. STEWART:  They've not been compensated.
 7   Liability has been determined, and they're trying to
 8   ascertain the amount of damages for the taking.
 9            THE COURT:  All right.  Now, I asked you five
10   questions.  Are you sure that you have answered them?
11            MR. STEWART:  I will run through them very quickly,
12   Your Honor.
13       The first one, do plaintiffs dispute that King County has
14   paid the taxes?  I don't know.  I think it's irrelevant.  I
15   think it is a red herring.  I think that whole issue -- the
16   railroad paid taxes for over a hundred years, and their
17   prescriptive easement did not turn into a fee ownership just
18   by the fact that they paid taxes, either.  I'm not sure who
19   King County is paying taxes to.  I don't think King County
20   pays taxes to themselves, and I also don't think that King
21   County pays for the entire 100 feet, either.  Honestly, as I
22   sit here, I do not know.  I'm not contesting it, though,
23   because I don't have any specific evidence on it, and I
24   believe it's, basically, irrelevant under the statute that
25   that is cited.
```

1          Are there any disputed facts which would prevent the court

2     from deciding this case as a matter of law?  I think it

3     depends on which issue the court decides.  Obviously, the

4     legal issues inherent in the Trails Act, no, I don't think

5     there's any impediment for this court to decide that.

6          On the width issue, that issue has been remanded back to

7     state court, and I think there are a number of factual issues

8     associated with the width issue.  I believe summary judgment

9     would be wholly inappropriate.

10          THE COURT:  Wait, wait.  Are you telling me it's not

11     part of my case anymore?

12          MR. STEWART:  I don't believe the width of the state

13     of this easement is part of this case, no, Your Honor, I do

14     not.  I believe that the legal principles are about how the

15     Trails Act is to be interpreted.

16          If the width issue is part of this case now, it should be

17     based on Washington law that has repeatedly said that the

18     width of a prescriptive easement is to be determined by the

19     use.

20          And there are a myriad of cases from the Washington

21     Supreme Court on that subject.  *Northwest Cities Gas* in 1943,

22     *Mahon v. Hass* in 1970, *Yakima Valley Canal* in 1969, several

23     precedents from the Washington Supreme Court that

24     specifically say that the -- when the railroad receives a

25     prescriptive easement, that it should be -- the width of that

1   easement should be determined by the use, and here the use

2   was established over 100 years --

3            THE COURT:  Counsel, you've got to back up here.  I'm

4   concerned about when is it that you think that I remanded

5   this to state court, the 100-foot issue?

6            MR. STEWART:  The case, Your Honor, was filed in

7   state court.  King County removed it to federal court, and

8   you removed it -- or remanded it back to state court.

9            THE COURT:  Okay.  But that's not this case.

10           MR. STEWART:  That's not this case, no --

11           THE COURT:  So --

12           MR. STEWART:  I don't believe the width issue is

13   actually an issue in this case.  And if it is, there are, as

14   I've pointed out before, a myriad of factual issues

15   associated with the width of the trail that would make it

16   inappropriate for summary judgment, in any event.

17           THE COURT:  Okay.  I'd like to have you address

18   yourself to what evidence do I have in front of me on this

19   motion that 100 feet is not necessary -- what competent

20   evidence do I have that 100 feet is not necessary for the

21   running of a railroad?

22           MR. STEWART:  I think there is records from Mr. Morel

23   about how wide it is at his location.

24           THE COURT:  Well, but that's one point.  That's one

25   small part.  But Mr. Morel is not an engineer, is he, that

1    would be competent to talk about what railroads need for, you

2    know, fire, safety, derailments, if they wanted to be a

3    pick-up point, if they wanted to have a switch put in.

4         MR. STEWART:  Well, Your Honor, the history of use, I

5    think, is undisputed.  They claim a 100-foot width, but

6    they've never used a 100-foot width.  And, in fact, King

7    County has easement agreements from several landowners here

8    at a 20-foot width.

9         And so under Washington law, if the width of a

10   prescriptive easement is determined by the history of use --

11        THE COURT:  Okay.  Well, the question I had for you

12   was, what evidence, besides Mr. Morel -- I understand he

13   played on the rock.  I query whether that was a good idea --

14   but he played on the rock, but where is the railroad

15   expertise that somebody would say, no, railroads don't need

16   that, all they need is the 18 feet that the car runs down?

17        MR. STEWART:  Well, I believe, Your Honor, it's based

18   on the history of use.  I do not have another affidavit from

19   a railroad engineer.  I would have provided, if our motion

20   for an extension of time had been granted, affidavits from

21   every one of these landowners about the width at their

22   location.  So it's not just Mr. Morel.  The fact of the

23   matter --

24        THE COURT:  All right.  So the answer is no.  The

25   only thing that I've got here is Mr. Morel claiming what the

```
 1    width is at his particular site?

 2            MR. STEWART:  And I believe the photographs, Your

 3    Honor, that are associated with that that show the actual

 4    history of use all demonstrate that it was only used at about

 5    14-feet or 18-feet width for this entire length.

 6            THE COURT:  Okay.  Thank you, counsel.

 7            MR. STEWART:  Thank you.

 8            THE COURT:  I'm going to come back to King County.

 9    Is the 100 feet part of this case?  Because I don't remember

10    it being eliminated.

11            MR. HACKETT:  May I speak from here, Your Honor?

12            THE COURT:  Yes, you can.

13            MR. HACKETT:  Yes, we do believe the 100 feet is part

14    of this case.  The plaintiffs are asking for a declaratory

15    judgment of quiet title.  You can't quiet title unless you

16    understand what the boundaries are that you're quieting title

17    to.

18        Also in our counterclaims that we brought, we asked

19    specifically that the court quiet title, then offer

20    declaratory judgment.  We cited 7.28.  There's -- in our

21    reply brief, I believe we have a significant section that

22    addresses why this issue is before the court.  The *Neighbors*

23    case was remanded, has been stayed under the priority action

24    doctrine pending the decision in this case.

25            THE COURT:  Okay.  Thank you.
```

1      Counsel, you can expect to see an opinion from me in about

2    ten days.  So I'll write for you on the topic, and that's

3    when we'll get it out.  Thank you for your arguments.

4           MR. HACKETT:  Thank you, Your Honor.

5

6                  (THE PROCEEDINGS CONCLUDED.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for
the United States District Court in the Western District of
Washington at Seattle, do hereby certify that I was present
in court during the foregoing matter and reported said
proceedings stenographically.

        I further certify that thereafter, I have caused
said stenographic notes to be transcribed under my direction
and that the foregoing pages are a true and accurate
transcription to the best of my ability.



        Dated this 18th day of May 2016.



                        /S/   Nancy L. Bauer

                        Nancy L. Bauer, CCR, RPR
                        Official Court Reporter